UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **CHEMO IBERICA, S.A.,**<br>　　　　　　　　　　**Plaintiff,**<br>**vs.**<br>**BETACHEM, INC.,**<br>　　　　　　　　　　**Defendant.** | Civ. No. 13-cv-4742 (KM)<br><br>OPINION |

**KEVIN MCNULTY, U.S.D.J.:**

　　Plaintiff Chemo Iberica, S.A. ("Chemo") commenced this action against Betachem, Inc. ("Betachem"). Chemo's complaint alleges that it provided Betachem with pharmaceutical products worth $824,731.25 for which it was not paid. Betachem responds that, pursuant to an oral agreement, it is Chemo that owes Betachem money for sales commissions. Those commissions, Betachem says, set off and indeed exceed the amount claimed by Chemo. Based on the alleged oral agreement, Betachem asserts counterclaims for breach of contract (Count I), unjust enrichment (Count II), promissory estoppel and detrimental reliance (Count III), breach of the covenant of good faith and fair dealing (Count IV), and implied contract (Count V). Now before the Court is Chemo's motion to dismiss the counterclaims with prejudice. For the reasons set forth below, the Court will grant the motion to dismiss, but without prejudice to the filing of amended counterclaims within 30 days.

**I.   BACKGROUND**

　　Chemo is a pharmaceutical company based in Spain that develops and manufactures active pharmaceutical ingredients ("APIs")—the raw ingredients drug companies use to create medications. Betachem is a New Jersey corporation that distributes and markets such APIs. Betachem acts as a

1

middleman in the pharmaceutical supply chain, purchasing APIs from manufacturers and reselling them to drug companies at a profit. Sometime in the 1990s—it is not clear when—Betachem began purchasing API from Chemo and importing it to the United States for resale. The parties did business together until September 20, 2011, when Chemo ended the relationship. (First Amended Answer and Counterclaims ("FAC"), Dkt. No. 22, ¶¶75-76)

Although it no longer intended to sell to Betachem, Chemo stated that it would still "honor existing open orders" as well as "any new orders" placed before December 31, 2011. (FAC ¶76) Chemo alleges that between September 2011 and October 2011, Betachem placed purchase orders for $924,160 worth of API. (Complaint, Dkt. No. 1, ¶¶11, 20) Chemo says that it fulfilled those orders between March 2012 and July 2012, but has yet to receive payment. Chemo claims that, after adjusting for credits owed to Betachem, the total value of these unpaid invoices is $824,731.25. (*See id.* at ¶¶21-22)

Chemo instituted the present action against Betachem on August 7, 2013. Chemo's Complaint asserts claims for breach of contract (Count I), goods sold and delivered (Count II), and accounts stated (Count III). Those three claims are closely interrelated; all assert that Betachem owes Chemo $824,731.25 for the APIs ordered and delivered but never paid for.

Betachem denies these allegations and contends that it is the party that is owed money. Betachem claims that it had a longstanding oral agreement with Chemo according to which it was entitled to a "tail" commission for Chemo products sold after the parties terminated their relationship. (FAC ¶77). Those payments, Betachem says, are calculated on a "5-3-1" basis—for Chemo products sold the first year after termination, it would receive a 5% sales commission, for products sold the second year, it would receive 3%, and for products sold the third year, it would receive 1% (hereinafter, the "5-3-1" agreement"). (*Id.*)

2

Based on the alleged oral 5-3-1 agreement, Betachem initially asserted a single counterclaim for breach of contract. (Answer and Counterclaims, Dkt. No. 5) However, after the Court granted Chemo's Motion for a More Definite Statement pursuant to Federal Rule of Civil Procedure 12(e) (Dkt. No. 6-1), Betachem filed a First Amended Answer and Counterclaims ("FAC"). The FAC asserts counterclaims for breach of contract (Counterclaim Count I), unjust enrichment (Counterclaim Count II), promissory estoppel (Counterclaim Count III), breach of the covenant of good faith and fair dealing (Counterclaim Count IV), and implied contract (Counterclaim Count V). The FAC includes additional details, such as lists of drugs allegedly subject to the 5-3-1 agreement. All told, Betachem estimates that its damages from Chemo's failure to pay the sales commissions exceed $5 million. (FAC ¶92-108)

Now before the Court is Chemo's motion to dismiss Betachem's counterclaims.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 12(b)(6) provides for the dismissal of a complaint, in whole or in part, if it fails to state a claim upon which relief can be granted. The moving party bears the burden of showing that no claim has been stated. *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005). For the purposes of a motion to dismiss, the facts alleged in the complaint are accepted as true and all reasonable inferences are drawn in favor of the plaintiff or counterclaimant. *Phillips v. County of Allegheny*, 515 F.3d 224, 231 (3d Cir. 2008) (stating that well-established "reasonable inferences" principle is not undermined by intervening Supreme Court case law).

Although a complaint need not contain detailed factual allegations, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,

3

555 (2007) (internal quotations omitted). The factual allegations must be sufficient to raise a plaintiff's right to relief beyond the merely speculative level to demonstrate that the claim is "plausible on its face." *Id.* at 570; *see also Umland v. PLANCO Fin. Servs., Inc.*, 542 F.3d 59, 64 (3d Cir. 2008). This requires the plaintiff to plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556). While this "plausibility standard" does not amount to a "probability requirement," it does ask for "more than a sheer possibility." *Iqbal*, 556 U.S. at 678. Stated differently, in reviewing the well-pleaded factual allegations and assuming their veracity, this Court must "determine whether they plausibly give rise to an entitlement to relief." *Iqbal*, 556 U.S. at 679. Finally, a complaint or counterclaim is subject to dismissal under Rule 12(b)(6) "when an affirmative defense like the statute of frauds appears on its face." *ALA v. CCAIR Inc.*, 29 F.3d 855, 859 (3d Cir. 1994).

### III. ANALYSIS

#### A. Counterclaim Count I – Breach of Contract

##### 1. Lack of specificity

The existence and terms of the alleged oral 5-3-1 agreement are not sufficiently pled under *Twombly* and *Iqbal*.

A commercial party who claims post-termination commissions under an oral agreement should be able to allege the fundamentals of contract formation; to allege that it made post-termination sales; and to allege the commissions that are owed. Betachem has failed to do that here.

Betachem has failed to allege facts sufficient to establish offer, acceptance, or the material terms of the 5-3-1 agreement. The FAC alleges generally that business was done on a "handshake" basis, but it does not describe any meeting or conversation in which the 5-3-1 agreement was arrived at. Betachem announces that it is entitled to post-severance commissions, but nowhere alleges such an understanding *with Chemo*. The FAC alleges that the

4

agreement was meant to compensate Betachem "for pending and continual projects the parties were engaged in." (Opposition, at 7) There is no mention of what these projects were, what acts the parties were expected to perform, or what understanding it had with Chemo as to the compensation Betachem was entitled to receive.

Upon cancellation, Betachem's principal, Mr. Gaunt allegedly expressed "shock[]" and told Chemo's representative that he thought some oral agreement did exist and was "customary" in the industry. (FAC ¶ 77) That unilateral statement falls short of a bilateral agreement. Yet it is virtually the only fact that the Counterclaim pleads in support of its contention that the 5-3-1 oral agreement even existed.

Should Betachem choose to amend its counterclaim, it should be mindful of the requirements of the substantive law of contracts. To be enforceable, a contract "must be sufficiently definite 'that the performance to be rendered by each party can be ascertained with reasonable certainty.'" *Weichert Co. Realtors v. Ryan*, 128 N.J. 427, 435, 608 A.2d 280, 284 (1992) (quoting *West Caldwell v. Caldwell*, 26 N.J. 9, 24-25, 138 A.2d 402 (1958)). *See Monroe v. Host Marriot Servs. Corp.*, 999 F. Supp. 599, 606 (D.N.J. 1998) (promise of "fair treatment" is too vague to be enforced as an employment contract). That principle applies *a fortiori* to a vaguely defined oral contract: "New Jersey law would bar enforcement of this oral promise because...the terms of this alleged promise cannot be reasonably ascertained." *Kreuzburg v. Computer Sciences Corp.*, 661 F. Supp. 877, 877 (D.N.J.1987) (citing *Woolley v. Hoffmann–LaRoche, Inc.*, 99 N.J. 284, 293 (1985)).

Of course, Betachem is not required to *prove* the existence of such a reasonably specific agreement at this preliminary stage. But it is required to *allege* that such a reasonably specific agreement exists. It has not done so.

### 2. Statute of frauds

Chemo argues that the alleged 5-3-1 agreement with Betachem, assuming it exists, constitutes a "transaction in goods" under article 2 of the

5

New Jersey Uniform Commercial Code ("UCC-Sales").[1] *See* N.J.S.A. 12A:2-102. As such, it is subject to the UCC-Sales statute of frauds. *See* N.J.S.A. 12A:2-201(1). The 5-3-1 agreement, being oral, is therefore unenforceable, and Betachem's counterclaim for breach of contract must be dismissed.

If a contract is governed by article 2 of the UCC and its value exceeds $500, the UCC's internal statute of frauds provides that it shall be unenforceable "unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought." N.J.S.A. 12A:2-201(1). Since Betachem alleges an oral contract, the dispute over the applicability of article 2 of the UCC is critical. The applicability of UCC-Sales depends on the nature of the contract: Contracts for the sale of goods are covered; service contracts are not. A "mixed" contract—one that concerns both goods and services—is covered if "the sales aspect predominates." *Quality Guaranteed Roofing, Inc. v. Hoffman-LaRoche, Inc.*, 302 N.J. Super. 163, 166 (App. Div. 1997) (quoting *Custom Communications Eng'g, Inc., v. E.F. Johnson Co.*, 269 N.J. Super. 531, 537 (App. Div. 1993)). To determine the predominant purpose of a mixed contract, courts ask whether the services contracted for "were merely incidental or collateral to the sale of goods." *Docteroff v. Barra Corp. of Am.*, 282 N.J. Super, 230, 240 (App. Div. 1995).

Chemo maintains that UCC-Sales applies because the alleged oral 5-3-1 agreement must be characterized as either a sales contract or a mixed contract in which the sales aspect predominates. Betachem's description of the agreement in its Counterclaim, Chemo says, clearly indicates that the commissions owed to Betachem depend on its sale of Chemo products. I agree.

---

[1] All citations to the UCC herein refer to the New Jersey version of Article 2, which is "known and may be cited as Uniform Commercial Code—Sales." N.J.S.A. 12A:2:101.

Betachem's function during the life of the Betachem/Chemo relationship was as follows:

> [T]he U.S. generic companies would place orders with Betachem who in turn, would place orders with Chemo Iberica. The spread between these two orders represented Betachem's profit. For products that were no commercially sold in the US, which in the early days was virtually everything, Betachem would receive a 10% profit. For products that were sold commercially, Betachem would receive 5% profit.

(FAC ¶56) That 5% or 10% profit may be an example of what Betachem refers to as its "commission," although this is never clarified in the FAC; perhaps the "commission" is something else. The alleged "tail commission" seems represent a continuation, on a diminishing basis, of that arrangement after the parties severed their relationship.

Be that as it may, the Counterclaim repeatedly emphasizes that Betachem's post-severance sale of pharmaceutical goods was to be the basis for its entitlement to a commission from Chemo. For example, in reference to a list of Chemo products allegedly subject to the 5-3-1 agreement, Betachem alleges that "[such] products were being marketed by Betachem and that Betachem would be entitled to a tail commission on these products sold to customers." (*Id.* at ¶78) Elsewhere, Betachem refers to a popular API manufactured by Chemo and concludes that "the sales of Guanfacine HCl—and Betachem's commission—should have increased many fold." (*Id.* at ¶81) These and other allegations in Betachem's Counterclaim establish that the sale of Chemo's products was the predominant focus of the alleged 5-3-1 agreement. (*See* FAC ¶¶ 79, 89, 91) Betachem does allege that it performed certain services under the agreement—chiefly, that it "marketed" Betachem's products (*id.* at ¶78)— but such efforts are incidental to sales. Nothing in Betachem's Counterclaim states or implies that Betachem expected to receive a tail commission for any "marketing" effort divorced from a sale.

The face of the Counterclaim establishes that the alleged 5-3-1 agreement is a contract for the sale of goods within the meaning of UCC-Sales.

Because this agreement was never reduced to a writing signed by Chemo, it is unenforceable under the UCC's statute of frauds.

Betachem advances two arguments to avoid this conclusion. Neither is persuasive.

First, Betachem tries to rewrite the FAC. For the first time, in its brief in opposition to the motion, Betachem says that it actually had *three* oral agreements with Chemo. (Betachem's Memorandum of Law in Opposition to Chemo's Motion to Dismiss Betachem's Counterclaims ("Opposition"), Dkt. No. 29, at 3). Neither the FAC nor the brief discloses the terms of such agreements, nor are we told how, when, or where these agreements were made. The brief attempts to give these alleged agreements heft by assigning them capitalized, underlined titles, but there is no indication that the parties ever used those titles before this action was filed.

One of these oral agreements, the "Sales Agreement," pertained to Betachem's purchases-for-resale of Chemo products. Another, the "Agency Agreement," required Betachem to market Chemo's products to buyers in the United States. Neither, says Betachem, is at issue here. (*Id.*) The "focus of [its] Counterclaims," it says, is a third agreement—the "Commission Agreement." (*Id.*) This Commission Agreement allegedly "did not contemplate a sale of goods or an exchange of services; it was simply an acknowledgment of the Parties' many years of working together, creating new markets and business." (*Id.*) "It was in essence, a type of consolation or severance package in the event of the termination of the relationship." (*Id.*) Apparently it corresponds to the alleged 5-3-1 Agreement. Once this third agreement is segregated from the other two, says Betachem, the sale of goods no longer predominates; it therefore is not a contract subject to UCC-Sales and its statute of frauds.

The Counterclaim must stand on its own; it cannot be saved by the radical reconstructive surgery in Betachem's brief. Not one of the three oral agreements is mentioned in the FAC. It is difficult to comprehend how a

Commission Agreement that did not "contemplate" sales could be the "focus" of Betachem's counterclaims; the counterclaims rest on Betachem's alleged contractual right to receive a commission based on "sales" or "products sold." (See FAC ¶¶78, 79, 81, 89, 91) Betachem explicitly alleges, for example, that "Chemo has failed to give [it] any accounting of its sales or *pay the sales commissions which it would have earned under the tail.*" (FAC ¶91) (emphasis added). Betachem's alleged damages derive entirely from the purported "fail[ure] to pay or account for [that] commission." (*Id.* at ¶92)

Perhaps Betachem thinks of this agreement as a kind of consolation or severance award. But a gold watch, even if presented upon retirement, remains a timepiece, and a contract of sale remains a contract of sale. If the sale of goods is not central to Betachem's counterclaims, why do they include lists of Chemo's products along with the commissions it expected to receive from their sale? If the "commission" in the Commission Agreement was not for the sale of Chemo products, then what was it for? Betachem's brief, to say nothing of the FAC, does not suggest an answer.[2]

---

2  Nor is the UCC statute of frauds the only potential bar. Irrespective of the UCC's definition of a "sales" contract, this alleged oral agreement would be subject to New Jersey's general Statute of Frauds ("SOF"). *See* N.J.S.A. 25:1-5(e). The SOF provides:

> No action shall be brought upon any of the following agreements or promises, unless the agreement or promise, upon which such action shall be brought...shall be in writing, and signed by the party to be charged therewith, or by some other person thereunto by him lawfully authorized.
>
> e. An agreement that is not performed within one year of the making thereof.

Under the alleged 5-3-1 agreement, Betachem would receive a sales commission of 3% for Chemo products sold in the second year and 1% for products sold in the third year after the termination of the parties' relationship. An agreement to pay commissions on sales occurring two or three years after the date the agreement became effective by definition cannot be "performed within one year."

On these multiple grounds, I reject Betachem's attempt in its brief to save the 5-3-1 agreement by rebranding it as the "Commission Agreement."

Betachem next argues that if the 5-3-1 agreement (or Commission Agreement) does fall within the scope of UCC-Sales, it still falls outside the scope of the UCC's statute of frauds "because Betachem fully performed its obligations." (*Id.* at 6) It is true that full performance "is a well established exception to the Statute of Frauds meant to prevent unjust enrichment." *Kreuzburg*, 661 F. Supp. at 879 (quoting *Edwards v. Wyckoff Electrical Supply Co.*, 42 N.J. Super. 236, 242 (App. Div. 1956)). But nowhere does Betachem assert in the FAC that it fully performed its obligations under the 5-3-1 agreement. Nor does it describe those obligations specifically enough to enable the reader to discern whether they have been fully performed or not.

For example, Betachem states that it is currently *attempting* to sell Chemo products. (*See, e.g.*, FAC ¶78) Betachem freely admits that certain of the products for which it expects a sales commission are "not available for sale in commercial quantities yet." (*Id.* ¶80) There is no specific allegation that Betachem actually sold any Chemo products post-severance, let alone a statement of the amounts sold or the commissions allegedly due.[3] The parts of the FAC that Betachem cites for the proposition that it "complete[d] its obligations" do not define any such obligations or allege that they were satisfied.[4] The allegations of the FAC do not establish that Betachem can avoid the UCC's statute of frauds on the basis of full performance.

---

[3]   The closest it comes is to list a number of products and to state that Betachem "would be entitled to a tail commission" based on their sale. (FAC ¶¶ 78, 80)) Betachem states in the FAC that it has attached a list of Chemo products "with sales and net profits for the year ended January 31, 2012," and that "[a]ny tail based on commercial products would start from this baseline." (FAC ¶89) (*Id.*) However, Betachem never provided this attachment.

[4]   Betachem cites to paragraphs 85 and 91 of its FAC. But these paragraphs neither mention Betachem's obligations nor allege that it fully performed them:

> 85. Initially Chemo shared sales information with Betachem. As such Betachem is entitled to $182,008.06.

For all of these reasons, Chemo's motion to dismiss is granted as to Betachem's counterclaim for breach of contract.

## B. Counterclaim IV – Breach of the Covenant of Good Faith and Fair Dealing

The dismissal of Betachem's counterclaim for breach of contract implies Counterclaim Count IV, for breach of the covenant of good faith and fair dealing, must be dismissed as well. A covenant of good faith and fair dealing is implied in all contracts. *See Sons of Thunder v. Borden, Inc.*, 148 N.J. 396, 420 (1997) ("Every contract in New Jersey contains an implied covenant of good faith and fair dealing.") But this covenant is an implied term *of a contract*; it presupposes the existence of a valid contract. "The doctrine of good faith and fair dealing cannot ... create rights or obligations in the absence of a valid contract." *Pepe v. Rival Co.*, 85 F. Supp. 2d 349, 390 (D.N.J. 1999), *aff'd*, 254 F.3d 1078 (3d Cir. 2001). *See also Wade v. Kessler Inst.*, 172 N.J. 327, 345, 798 A.2d 1251, 1262 (2002) ("To the extent plaintiff contends that a breach of the implied covenant may arise absent an express or implied contract, that contention finds no support in our case law.") Where, as here, the contract is unenforceable, neither party is bound by any alleged covenants therein, whether express or implied.

Having found no valid, enforceable contract, I must also dismiss Betachem's counterclaim for breach of the covenant of good faith and fair dealing. *See Comcast Spectacor L.P. v. Chubb & Son, Inc.*, 2006 WL 2302686, at *19 (E.D. Pa. Aug. 8, 2006) ("[W]e must dismiss the claim for breach of implied duty of good faith and fair dealing if we dismiss the breach of contract claim.")

---

> 91. Since the formal termination of the relationship, Plaintiff has failed to give Betachem any accounting (except Exhibit A) of its sales or pay the sales commissions which it would have earned under the tail. Betachem is entitled to an award which would count as a set-off to any monies allegedly owed [sic] Plaintiff in an amount presently unknown, but which will be proved at trial after discovery.

### C. Betachem's Remaining Counterclaims

Betachem's remaining counterclaims must also be dismissed. Each of these—unjust enrichment (Counterclaim Count II), promissory estoppel (Counterclaim Count III), and implied contract (Counterclaim Count V)—seeks relief under a quasi-contract theory. "Courts generally allow recovery in quasi-contract when one party has conferred a benefit on another, and the circumstances are such that to deny recovery would be unjust." *Weichert Co. Realtors v. Ryan*, 128 N.J. 427, 437, 608 A.2d 280, 285 (1992). Here, however, the FAC does not allege facts sufficient to state such a claim.

Under New Jersey law, to recover on a theory of promissory estoppel, a claimant must allege and prove that: (1) there was a clear and definite promise; (2) the promise was made with the expectation that the promisee would rely upon it; (3) the promisee reasonably did rely on the promise; and (4) the promisee incurred a detriment as a result of that reliance. *Del Sontro v. Cendant Corp.*, 223 F. Supp. 2d 563, 574 (D.N.J. 2002) Nothing in Betachem's pleading suggests that Chemo made any clear or definite promise to pay a commission on the sale of its products after severance of the relationship. I would expect to see, for example, some specific allegation as to who made the promise, when it occurred, and what it consisted of. There is no such direct allegation.

Nor is there any indirect allegation. Betachem seems to rely on some vague notion that the parties had a tacit understanding. There is no factual allegation that Chemo's payment of sales commissions during the relationship implied an undertaking to pay them after the relationship ended. There are no descriptions of communications regarding the details of such commissions, such as their amount or date of payment. In short, there is nothing to substantiate Betachem's counterclaim for promissory estoppel apart from its own "labels and conclusions." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Counterclaim Count III must therefore be dismissed.

Betachem also fails to state a claim for unjust enrichment or implied contract (quantum meruit). These are typically pled together in the absence of a valid and enforceable contract. *See Ramon v. Budget Rent–A–Car Sys.*, 2007 WL 604795, at *5 (D.N.J. Feb. 20, 2007) (quasi-contract theories of recovery are generally disfavored where a valid, express contract covers the subject matter in dispute). To establish a claim for unjust enrichment, "a plaintiff must show both that [the] defendant received a benefit and that retention of that benefit without payment would be unjust." *VRG Corp. v. GKN Realty Corp.*, 135 N.J. 539, 554 (1994). To recover in quantum meruit, the claimant "must establish that the services were performed with an expectation that the beneficiary would pay for them, and under circumstances that should have put the beneficiary on notice that the plaintiff expected to be paid." *Weichert Co. Realtors v. Ryan*, 128 N.J. at 438, 608 A.2d at 286. These causes of action, though similar, are nevertheless distinct: under quantum meruit, a court may find the parties' relationship sufficiently contractual as to permit implication of a contract "in fact." Under unjust enrichment, by contrast, recovery is not premised upon a contract, but rather upon society's interest in preventing one party from retaining a benefit without compensating the provider. *See generally Barnert Hosp. v. Horizon Healthcare Servs., Inc.*, 2007 WL 1101443, at *6 (D.N.J. Apr. 11, 2007).

Betachem has not pled facts that would entitle it to relief under either theory. The only injury apparent on the face of the FAC is that Chemo failed to pay the sales commissions owed to Betachem under the alleged 5-3-1 agreement. Even if true, this would not amount to a claim for unjust enrichment. Betachem's business model was to order APIs from manufacturers like Chemo for resale at a profit. (*See* FAC ¶56) The FAC does not allege facts sufficient to demonstrate that Betachem projected profit was a "benefit" that it conferred on Chemo and is entitled to recover.

13

Betachem's quantum meruit counterclaim founders for much the same reason. Conclusory statements aside, Betachem has not proffered facts showing that it continued to order and market Chemo's products after the parties terminated their relationship with the expectation that it would receive a sales commission. Without this, there is no basis upon which the Court can imply the existence of contract in fact for the payment of "tail" sales commissions.

Counterclaim Counts III and V are therefore dismissed.

### IV. CONCLUSIONS

For the reasons stated above, Chemo's motion to dismiss the Counterclaim on Rule 12(b)(6) grounds is **GRANTED**. Betachem has already received one opportunity to replead in response to a Rule 12(e) motion for a more definite statement. Nevertheless, this is the first dismissal of its claims. *See generally Philips v. County of Allegheny*, 515 F.3d 224, 236 (3d Cir. 2008) (opportunity for amendment generally favored unless "inequitable or futile"). I therefore order that this dismissal is **WITHOUT PREJUDICE** to Betachem's filing an amended pleading within 30 days.

_____
KEVIN MCNULTY, U.S.D.J.

Date: March 25, 2015